Filed 6/29/22  P. v. Nunez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>VICTOR NUNEZ,<br><br>  Defendant and Appellant. | F080359<br><br>(Kern Super. Ct. No. BF171239A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Robert K. Gezi, William K. Kim, Daniel B. Bernstein, and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

Defendant Victor Nunez (defendant) shot and killed an individual shortly after the individual had an altercation with a fellow member of defendant's gang, codefendant Fernando Rojas. He was convicted of several crimes in connection with the incident, including first degree murder with the gang-murder special circumstance.

The Attorney General concedes that, as a result of the passage of Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333), defendant's conviction for active gang participation and his gang enhancement must be reversed. We accept that concession.

We further conclude the court erred in denying defendant's *Pitchess*[1] motion as to several law enforcement officers who testified at trial. We will conditionally reverse pursuant to the procedure outlined in *People v. Hustead* (1999) 74 Cal.App.4th 410, 418–419.

Defendant's eventual resentencing moots his challenge to a parole revocation fine imposed by the court.

We reject defendant's remaining contentions, including a *Batson*/*Wheeler*[2] claim and a challenge to his gang-murder special circumstance based on changes made to Penal Code section 186.22[3] by Assembly Bill 333. We hold that allowing Assembly Bill 333's changes to section 186.22 to affect section 190.2, subdivision (a)(22) would constitute an impermissible amendment of Proposition 21, which was approved by voters in 2000.

## BACKGROUND

In an amended information filed August 14, 2019, the Kern County District Attorney charged defendant with premeditated murder (count 1; §§ 187, subd. (a) & 189), active gang participation (count 2; § 186.22, subd. (a)), and possession of a firearm as a

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.
[2] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).
[3] All further statutory references are to the Penal Code unless otherwise stated.

2.

misdemeanant (count 3; § 29805.)[4]  The information further alleged:  Defendant committed the murder for the benefit of, at the direction of, or in association with the Varrio Chico Lamont (VCL) criminal street gang; the gang-murder special circumstance applied (§ 190.2, subd. (a)(22)); and firearm enhancements to the murder count under sections 12022, subdivision (d) and section 12021.5.

A jury convicted defendant on counts 1, 2, and 3.  The jury also found true the gang enhancement (§ 186.22, subd. (b)(1)), gang-murder special circumstance (§ 190.2, subd. (a)(22)), and firearm enhancements under sections 12022.53, subdivisions (d) & (e)(1) and 12022, subdivision (d) as to count 1.

The court sentenced defendant to life in prison without the possibility of parole on count 1, plus 25 years to life (§ 12022.53, subds. (d) & (e)(1)), plus three years (§ 12022, subd. (d)), plus one year (§ 12022, subd.(a)(1).  The court stayed punishment on the enhancement pursuant to California Rules of Court, rule 4.447.  On count 2, the court imposed a stayed (§ 654) term of three years, plus 10 years for the firearm enhancement (§ 12022.5, subd. (a).  On count 3, the court imposed a stayed (§ 654) term of three years, plus three years pursuant to section 186.22, subdivision (d).

The court also imposed various fines and fees, including a restitution fine of $300 pursuant to section 12022.45.

### FACTS

Surveillance footage from an internet casino showed codefendant Fernando Rojas arriving in a silver BMW at around 1:15 a.m. on February 3, 2018.  Rojas entered the casino, whereafter he and defendant conversed, drank beer, and played a casino game.

At around 2:04 a.m., a man named Brandon Ellington was outside the casino exchanging something with an individual whose car door was open.  Ellington had

---

[4] Codefendant Fernando Rojas was also charged with counts 1 and 2.  Rojas was charged individually with one count of possession of a firearm as a felon (count 4; § 29800, subd. (a)(1).)

something in his hand. A package of marijuana was later found in his pocket. An unidentified individual hit Ellington in the face.

Around the same time, Rojas walked out with an unknown individual. Defendant was standing at the entrance. Rojas extended his left arm while holding what appeared to be a beer bottle. Ellington took off his shirt, squared off against Rojas, and extended both of his arms over his head. Rojas threw the beer bottle. Ellington then left the view of the camera.

Defendant and Rojas jogged to their BMW toward the entrance of the casino. Rojas drove the BMW away from the casino with defendant in the front passenger's seat. Rojas made a northbound turn onto South Union Avenue at about 2:08 a.m.

Surveillance footage from a nearby store showed a silver BMW pulling up near Ellington. The footage shows an individual exiting the passenger's side followed by muzzle flashes. Ellington ran toward a nearby market after being struck by a bullet. Eventually, Ellington collapsed. His body was later found by law enforcement at that location. The shooter then reentered the BMW which sped away.

Ellington had suffered a gunshot wound to his chest. The wound was lethal, striking Ellington's left lung, heart, and then right lung before exiting the body. The wound had "stippling" – which is partial gunpowder burns. However, the wound had no visible soot. Based on "rough generalizations," a pathologist testified that stippling without soot is consistent with the firearm being between six to 18 inches away from the victim when the lethal shot was fired. Ellington also had blunt force injuries.

Five spent nine-millimeter shell casings were found at the scene.

On February 9, 2018, an undercover officer arrested Rojas at the same internet casino. The same day, officers located defendant hiding behind a shipping container in a parking lot. Defendant was found with an active VCL gang member. Defendant tossed a black handgun away before surrendering. A criminalist from the regional crime

4.

laboratory testified that, in his opinion, it was the gun that fired the spent casings at the scene. The DNA profile on the gun matched defendant.

Rojas denied involvement to law enforcement. He said he heard about the shooting from other people and from newspapers but was not personally involved. Rojas initially claimed he was not even at the internet casino on the night Ellington was killed. However, officers showed him a still photograph from the surveillance footage, and defendant admitted he was depicted therein. Rojas then admitted he was drunk. Rojas claimed Ellington had a knife, was saying things like, "I'll kill all you guys," and "white pride."

However, Rojas consistently denied involvement in the shooting.

Rojas said he had "connections" and that everyone knew he was "from the streets." Rojas said people listen to him because he is a "big guy."

***Gang Evidence***

Officers asked Rojas if he was involved in gangs in Lamont. Rojas claimed he was not currently active.

Deputy Sheriff Fernandez testified as a gang expert for the prosecution. Fernandez testified about a Kern County gang called Varrio Chico Lamont (VCL), including common tattoos among its members, their hand signs, primary activities, and predicate offenses.[5] Varrio Chico Lamont is a subset of Lamont 13.

Deputy Fernandez opined that defendant and Rojas were active members of the Varrio Chico Lamont gang on February 3, 2018. Fernandez also testified that a hypothetical crime aligned with the prosecutor's view of the evidence would be considered to have been committed "in association with" the Varrio Chico Lamont gang.

Deputy Fernandez testified that "respect" is one of the primary things a member of the Varrio Chico Lamont gang seeks. If a perceived disrespect to a member of Varrio

---

[5] Defendant and Rojas were not involved in the predicate offenses.

5.

Chico Lamont went unanswered, the disrespected member would lose standing in the gang. Thus, disrespected members would be required to respond, usually with violence, to "save face."

Gang members also commit violent crimes like murder to enhance their reputation within the gang and the gang's reputation in the community. This reputation enhancement discourages people from "talk[ing]" to law enforcement, which allows the gang to continue committing crimes.

### Prior Contacts

Prosecution witnesses testified regarding defendant's prior contacts with law enforcement.[6]

When in eighth grade, defendant wrote "VCL 13" with a blue sharpie on his desk. Defendant said "VCL" stood for Varrio Chico Lamont and that, while he was not a member, he "backs up the gang."

Deputy Perez testified that when defendant was 14 years old, a sheriff's deputy stopped him while he was riding his bicycle in Lamont. Defendant said he was from Lamont and "backed up the gang." The deputy asked defendant who the gang's rivals were, and he responded that their enemy was the Arvin gang. The deputy documented defendant as an admitted Lamont gang member.

On April 17, 2011, law enforcement contacted defendant in the company of Angel Fuentes – an individual who Deputy Fernandez testified was a VCL gang member.

On May 9, 2011, law enforcement responded to a report of juveniles drinking in front of a house in Lamont. At the home, law enforcement encountered defendant with three Lamont 13 gang members. One of the gang members has VCL tattoos.

On May 26, 2011, law enforcement attempted to stop a Nissan Sentra with no rear license plate. Defendant was driving the Sentra. The vehicle failed to stop, even after the

---

[6] Deputy Fernandez detailed Rojas's prior contacts with law enforcement. Defendant was not present during Rojas's prior contacts.

deputy activated his red/blue lights, and siren. The vehicle "blew a stop" and continued for about a mile before crashing into a pickup truck parked on the side of the street. Two other occupants of the vehicle were documented members of the Lamont 13 gang.

On November 14, 2011, law enforcement encountered defendant at a residence in Lamont along with multiple VCL gang members. Defendant said he was an affiliate of the VCL gang but had not been "jumped in."

On December 6, 2011, law enforcement encountered defendant and two other individuals near the intersection of Hall Road and Myrtle Avenue in Lamont.[7] Defendant said he was an affiliate of VCL, and his moniker was Lil' Sporty.

On February 2, 2013, law enforcement encountered defendant at a residence in Lamont along with multiple members of VCL and Lamont 13. On March 3, 2013, law enforcement again encountered defendant at the same residence along with multiple members of Lamont 13 and a member of VCL.

On August 13, 2015, law enforcement stopped a vehicle in which defendant, a VCL member, and others were traveling.

On September 16, 2015, Deputy Fernandez encountered defendant walking down the street, wearing a jersey with the number 13. Thirteen is a very common number used by the gang. It is common for sports jerseys to signify membership in the gang. When defendant saw Fernandez's patrol car, he made an "L" with his index finger and thumb.[8]

On February 28, 2016, law enforcement stopped a vehicle in which defendant was a passenger. Two other occupants of the vehicle were VCL gang members.

---

[7] Deputy Romo, who testified as to this prior contact, said he did not have an independent recollection of the contact and was relying on the field identification card he prepared.

[8] Deputy Fernandez had previously testified that it was defendant's companion, not defendant who had made the "L" sign.

On March 16, 2016, law enforcement responded to defendant's apartment and conducted a search. They found a green Hulk doll with writing on it from a permanent marker. The writing included, "VCL," "Varrio Chico Lamont," and "Sporty."

On September 8, 2017, law enforcement stopped a vehicle in which defendant was a passenger and the driver was a member of Lamont 13 and VCL.

## DISCUSSION

## I.    Defendant Has Not Established Reversible Batson/Wheeler Error

During jury selection, defendant made a motion pursuant to *Batson/Wheeler*. which the court denied. Defendant's motion challenged "the dismissing of [C.C.] specifically" and was supported by the prosecutor's dismissal of other Hispanic jurors.[9] Defendant's counsel observed the prosecutor had dismissed three or four Hispanic jurors before C.C. On appeal, he contends the court erred in denying his motion.

### A.    *Background*

The court had prospective jurors fill out a questionnaire. The questionnaire explained that any questions or concerns based on the prospective juror's answers would be addressed outside the presence of other jurors. The questionnaire asked the following questions:

> "1.    Have you ever been affected, directly or indirectly, by gang activity or gang violence?
>
> "2.    Has anyone close to you, such as a friend or relative, ever been affected, directly or indirectly, by gang activity or gang violence?
>
> "3.    Have you ever been accused of being in a criminal street gang?

---

[9] While potential jurors are not afforded the same confidentiality as seated jurors, we will be discussing in this opinion answers they provided on a questionnaire labeled "confidential" and therefore suppress both first and last names. It is important to note that the Attorney General agrees that A.H., A.M., D.M., A.L., and C.C. all have Hispanic surnames.

8.

"4.     Has anyone close to you, such as a friend or relative, ever been accused of being in a criminal street gang?

"5.     Have you ever witnessed or investigated, formally or informally, any act of alleged gang crime?

"6.     Do you have a special gang-related concern that would make it extremely difficult for you to sit as a juror in this case?

"7.     Do you have any training or education about criminal street gangs?

"8.     If you answered 'yes' to any question above, is that going to affect your ability to give all sides a fair trial?

"9.     This case is expected to last through September 20, 2019. We will not be in session on September 2, 2019 (Monday) and September 12–13, 2019 (Thursday and Friday). Do you have any hardship that would make it difficult for you to serve as a juror in this case?"

Prospective jurors who answered "yes" to any of the questions were brought in for individual questioning. Prospective jurors who answered "no" to all of the questions were asked to return later for general voir dire. C.C. answered "no" to all the gang-related questions and was asked to return for general voir dire.

Later in voir dire, the court asked the following question of prospective jurors:

"If you were not here today, what would you be doing? If you work outside of the home, what type of work do you do? I do not need to know the name of your employer unless you work for a public or government entity. …

"If you have a significant other, we would like to know that. If that significant other works outside of the home, what type of work does that person do?

"If you have children, how many do you have, what are their approximate ages, and what are they doing for a living?

"I do not want to know your physical residential address, but I would like to know in which part of the county you reside; so if you live in Bakersfield, you can identify it by region, such as northeast, northwest, central, southeast, southwest, et cetera. If you live outside of Bakersfield, you can identify it by the city name in which you live, so Wasco, Tehachapi, Delano, Wofford Heights, et cetera."

### B.    *Challenges*

Below, we outline peremptory challenges made prior to the *Batson/Wheeler* motion.

After an initial seating of prospective jurors, defense counsel jointly challenged L.C. and El.R. The prosecutor exercised a peremptory challenge on A.M. The defense then jointly exercised a peremptory challenge on prospective juror Jo.B. The prosecutor next exercised a peremptory challenge on prospective juror, A.H. The defense then exercised a joint peremptory challenge to prospective juror E.B. The dismissed prospective jurors were replaced, the new panel members were questioned, and challenges resumed. The prosecutor exercised a peremptory challenge on A.L. The defense jointly exercised a peremptory challenge as to V.H.

The prosecutor then stated he accepted the jury panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror G.A. The prosecutor then again accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror M.W. Again, the prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror P.R. P.R. was replaced on the panel by prospective juror D.M., who the prosecutor then dismissed with a peremptory challenge. The defense jointly exercised a peremptory challenge as to prospective juror C.H.

Additional prospective jurors were called forward, including C.C. The court asked the new prospective jurors to provide the personal information previously provided by other prospective jurors. C.C. explained she is an "administrative assistant/ACES mentor" for a school district and lived in Delano. C.C. was single and had no children.

Later, C.C. said:

> "I can follow the concept of the law. I don't have prior jury service. I've never been a victim of a crime, close to me either, anybody close to me.

Nobody close to me has been charged or accused of committing a crime. I do know I have a cousin and two uncles who are retired from the prison. And then my cousin, he's a counselor as Wasco State Prison. I don't recognize anybody from the witness list. I don't recognize attorneys or defendants. I don't recognize my prospective jurors. And I can follow the law as instructed in this case."

Defendant's counsel asked if there was anything about her relatives' jobs that would affect her decision as a juror, and C.C. responded, "No, sir."

Counsel later asked what her job entailed, and C.C. explained: "Mainly I work with the extended learning program, so I just get the day ready for all the managers of the after-school program and daycare programs. I'm the director of the extended learning program." The extended learning department included afterschool programs, preschool, summer school and daycare.

C.C. was currently in college and did not have a teaching credential or college degree.[10] She planned to earn a degree in early childhood development and become a teacher after obtaining a credential in special education and general education. In later questioning, she said she definitely wanted to become a teacher but was not sure about special education versus general education.

When asked what she thought of the criminal justice system, C.C. said, "I really don't pay mind to it." C.C. said good jurors were important to a fair system and that she believed she could be a fair and unbiased juror.

Codefendant's counsel briefly questioned C.C. about whether jury service would interfere with her college studies. C.C. said it would not affect her educational advancement because she was studying online.

When asked how much she wanted to be on the jury on a scale from one to 10, C.C. responded, "Like an eight." When asked why, she said, "I'm interested and, like I

---

[10] C.C. later said she would be *starting* her bachelor's program in January.

11.

mentioned before, I've never experienced this and I would like to experience it." She said, "Since I never pay mind to it, I thought since I'm here I might as well do it."

The challenge process eventually resumed, beginning with the prosecutor. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror L.D. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror Ji.B. The prosecutor accepted the panel as constituted. The defense jointly exercised a peremptory challenge as to prospective juror S.S. Mr. Sanchez was replaced by C.C., who the prosecutor dismissed with a peremptory challenge.

Defendant's counsel then made a motion pursuant to *Wheeler*, *supra*, 22 Cal.3d 258 and *Batson*, *supra*, 476 U.S. 79.

The prosecutor responded by observing that he had accepted the panel with people of Hispanic descent on numerous occasions only to have them removed by the defense. The prosecutor acknowledged C.C. was of Hispanic descent based on her appearance and name. The prosecutor explained, "Her responses in regards to the field that she wants to go into and her physical demeanor on Friday were things that I looked at in terms of dismissing her, and appears that she lacks, I guess, the life experience that I'm looking for in a case like this."

The court sought clarity from counsel on the scope of the *Batson/Wheeler* motion, saying, "I know it arose when [C.C.] was released. [Rojas's counsel], then, as well as you, indicated that there were a number of individuals of the Hispanic race or ethnicity that were released. Are you challenging as it relates to each of them individually or [C.C.] specifically and individually?" Defendant's counsel responded that he was challenging the "dismissing of [C.C.] specifically, noting the pattern of dismissing Hispanic jurors."

12.

Defendant's counsel said he did not notice any issues with C.C.'s body language, that she appeared to be intelligent and was "gainfully employed." Counsel argued the prosecutor's stated reasons for dismissing C.C. were "quite vague" and insufficient.[11]

Codefendant's counsel observed that the prosecutor had asked very few questions of C.C. and that she was intelligent, educated, and fairly articulate.

The court found that a prima facie case had been made because the four jurors were members of a cognizable group. The court asked the prosecutor to restate the reasons for dismissal.

The prosecutor discussed C.C. as follows:

> "[C.C. is] from Delano. Yes, she does have a good job as an admin assistant; however, she still is young and how her projected – her intended field of study, which is to be a teacher and possibly be a special ed, as my previous individual, [A.L.], I have concerns of individuals that I believe they're very sympathetic in how they view things. I want a juror who's going to be able to view things without sympathy or bias. And those are questions I went into, that my personal experiences that the teachers in that field tend to go into that for some reason and, based on that, I did dismiss her."

The prosecutor then noted that he frequently accepted the panel with Hispanic jurors on it. The court said, "Just for the record … it appears that you accepted three times in a row, followed by four times in a row. So you have accepted seven separate times."

The court then stated its ruling as follows:

> "The court does accept [the prosecutor's] representations that he released five individuals for group neutral reasons. Some reasons that have been articulated following the category of juror characteristics such as age, body language, as well as an unconventional lifestyle, those certainly do qualify as juror characteristics that are group neutral and do not apply, specifically, to one cognizable group.

---

[11] Codefendant Rojas's counsel challenged the dismissal of all four prospective jurors with Hispanic surnames.

"Additionally, the reference to concerns regarding the gang questionnaire certainly appeared to be genuine. And to the extent it would rise to the level of a concern, to exercise or justify a peremptory challenge is understandable, given the nature of this particular case. [¶]

"To the extent there have been a number of Hispanic individuals who have been accepted on the panel, at one time or another, the court does not look for a pattern of discrimination. While that was the law quite a few years ago, it is no longer the case and a *Batson/Wheeler* motion can be run, even on a single peremptory challenge, since it does not affect an individual's due process rights as it relates to a discriminatory purpose for any individual being released from the panel without justification or without a group neutral reason.

"So while I do understand and place it in its proper context that the panel has been accepted seven separate times with individuals remaining on the panel that appear to be of Hispanic descent does not sway this court in any particular fashion. Only to the extent the court can consider it for the limited purpose of determining how many additional individuals are on this panel of Hispanic origin.

"But for purposes of releasing these individuals specifically, while opposing counsel might not agree with the reasoning behind releasing an individual when considering the totality of the circumstances of the individual's representations, this court must consider it as it relates to the reasons stated by the party who is exercising a peremptory challenge to release the individual and determine whether those reasons are genuine or fabricated.

"It appears to the court that [the prosecutor's] reasoning, as stated on the record two separate times, certainly do qualify as neutral reasons for purposes of a defense to this motion. On that basis, the court is going to deny the *Batson/Wheeler*."

C.    *Analysis*

### 1.    Defendant Only Preserved a Batson/Wheeler Challenge as to C.C.

At trial, defendant made the *Batson/Wheeler* as to C.C. specifically. On appeal, defendant seeks to challenge the prosecutor's dismissal of other jurors beyond C.C.

"In order to preserve a *Batson/Wheeler* claim based on the prosecutor's peremptory challenges, the defendant must make a timely objection. [Citation.] To be

14.

timely, a *Batson/Wheeler* objection must be made before the jury is sworn." (*People v. Cunningham* (2015) 61 Cal.4th 609, 662.) Here, defendant made a timely *Batson/Wheeler* objection as to C.C., but not as to any other prospective jurors. Therefore, defendant forfeited any *Batson/Wheeler* objections as to prospective jurors other than C.C.[12]

### 2. Defendant has Failed to Establish the Dismissal of C.C. Violated Batson/Wheeler

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." ' [Citation.] ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' [Citation.] The law also recognizes ' "a rebuttable presumption that a peremptory challenge is being exercised properly, and the burden is on the opposing party to demonstrate impermissible discrimination." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760 (*Holmes*).)

" 'A three-step procedure applies at trial when a defendant alleges discriminatory use of peremptory challenges. First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant

---

**12** The fact that codefendant Rojas made a broader *Batson/Wheeler* objection does not alter this conclusion, as defendant did not join nor make the same objection. (See, e.g., *People v. Chism* (2014) 58 Cal.4th 1266, 1292–1293; see also *People v. Santos* (1994) 30 Cal.App.4th 169, 180, fn. 8, disapproved on other grounds by *People v. Dalton* (2019) 7 Cal.5th 166, 214; *People v. Miranda* (1987) 44 Cal.3d 57, 77–78, overruled on other grounds by *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.)

has shown purposeful race discrimination.  [Citation.]  'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' " (*Holmes*, *supra*, 12 Cal.5th at p. 760.)

" ' "The proper focus of a *Batson/Wheeler* inquiry, of course, is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons.  … All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory." ' [Citation.]  ' "At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*People v. Miles* (2020) 9 Cal.5th 513, 539 (*Miles*).)

" ' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine." ' " ' [Citation.]  However, ' "[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." ' " (*Miles*, *supra*, 9 Cal.5th at p. 539.)

"Where, as here, the trial court ruled pursuant to the third stage of the analysis, we skip to that stage to examine whether the trial court properly credited the prosecutor's reasons for the challenges.  'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.]  "We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." ' [Citation.]  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide

16.

reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." ' " (*Miles*, *supra*, 9 Cal.5th at p. 539.)

### D. *C.C.*

Recall the prosecutor identified several bases for dismissing C.C., including "the field that she wants to go into," her physical demeanor, and lack of life experience.

The prosecutor also stated the following,

> "[C.C.'s] from Delano. Yes, she does have a good job as an admin assistant; however, she still is young and how her projected – her intended field of study, which is to be a teacher and possibly be a special ed, as my previous individual, [A.L.], I have concerns of individuals that I believe they're very sympathetic in how they view things. I want a juror who's going to be able to view things without sympathy or bias. And those are questions I went into, that my personal experiences that the teachers in that field tend to go into for some reason and, based on that, I did dismiss her."

Defendant argues the prosecutor's reason was not supported by the record. Not so. When asked, "What's your intended field of study?" C.C. responded: "I'm going for my bachelor's in early childhood development. I want to earn my credential in special ed and general education." She was then asked, "You want to teach?" and she replied, "Yes." The prosecutor's stated reason, that C.C.'s intended field of study was to be a teacher and possibly a special education teacher is directly and clearly supported by the record.

Defendant disagrees, pointing to a question posed by the prosecutor to C.C., wherein he asked, "You work with early special education students?"[13] C.C. replied, "No. I work for the after-school department. I'm going to school to be – work for that."

_____

[13] Defendant makes much of the fact that the prosecutor's phrasing indicated that he incorrectly thought she already worked with special education students. However, a voir dire question phrased as a statement giving the prospective juror the opportunity to confirm (or reject) it is not akin to misrepresenting a prospective juror's responses when stating reasons for dismissal. Here, the important fact is that the prosecutor correctly represented the record when stating his reasons for dismissing C.C.

The prosecutor asked, "You're studying for that?" and C.C.' responded, "Yes." C.C. said she definitely wanted to be a teacher but had not made up her mind if she wanted to teach in general education or special education so, she was going to get a dual credential.

However, none of this contradicts the description of C.C.'s responses given by the prosecutor while stating his reasons for dismissal. C.C.'s intended field of study was teaching, and C.C. was clear that special education was one specialty she might pursue. Defendant has failed to show the prosecutor's stated reason was unsupported by the record.

### E.    *Juror 5097137*

Defendant briefly observes that the prosecutor did not challenge Juror 5097137, a retired teacher, nor ask whether she had been involved in special education. However, "for a comparative analysis to be probative, a seated juror must have a ' "substantially similar *combination* of responses," in all material respects' to an excused juror." (*People v. Bryant* (2019) 40 Cal.App.5th 525, 540.) Juror 5097137 has previously served as a juror and the jury on which she served successfully reached a verdict. In her prior service, Juror 5097137 worked hard to understand the law to be applied, read the jury instructions, and applied the law to the facts. Her prior jury service was a "very positive experience." A prosecutor can consider a prospective juror's service on a prior criminal case in which a verdict was successfully reached as indicative of someone who can "deliberate effectively" and would therefore be a desirable juror. (See *People v. Chism*, *supra*, 58 Cal.4th at p. 1322.) In contrast, C.C. had never served on a jury.

There was also an apparent age gap between the two, as Juror 5097137 had a 40-year-old child, whereas C.C. was a college student.

C.C. and Juror 5097137 are not sufficiently comparable to undermine the sincerity of the prosecutor's stated reasons or the trial court's ruling.

**II.    Under Assembly Bill 333, Defendant's Conviction for Active Gang Participation, the Gang Enhancement and the Vicarious Firearm Enhancement Must be Reversed**

Defendant contends that under Assembly Bill 333, his conviction for active gang participation, and the gang enhancement under section 186.22, subdivision (b) must be reversed.  Under Assembly Bill 333 (2021–2022 Reg. Sess.), "benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational."  (§ 186.22, subd. (g).)  The Attorney General concedes that a reasonable jury could conclude the "common benefit" of the murder in this case was not more than reputational, and we accept the concession.  (See *People v. Vasquez* (2022) 74 Cal.App.5th 1021, 1032–1033.)

The prosecution may retry defendant on the reversed conviction and enhancement.  (See *People v. Vasquez*, *supra*, 74 Cal.App.5th at p. 1033.)

**III.    Assembly Bill 333 Impermissibly Amends Proposition 21**

**A.    *Proposition 21***

Voters approved Proposition 21 on March 7, 2000.  In that initiative, the voters found that "[c]riminal street gangs and gang-related violence pose a significant threat to public safety and the health of many of our communities.  Criminal street gangs have become more violent, bolder, and better organized in recent years."  (Prop. 21, § 2(b).)  The voters predicted that "[t]he problem of youth and gang violence will, without active intervention, increase…."  (*Ibid.*)

Accordingly, voters concluded that "[g]ang-related felonies should result in severe penalties.  Life without the possibility of parole or death should be available for murderers who kill as part of *any* gang-related activity."  (Prop. 21, § 2(h), italics added.)  To implement this goal, Proposition 21 made several statutory changes including the one at issue here: adding a new subdivision to section 190.2.  That statute sets forth a list of special circumstances in which the punishment for first degree murder is set at death or

life in prison without the possibility of parole (LWOP).[14] (See § 190.2, subd.(a).) Proposition 21 added a new special circumstance to this list, which applies to murders where:

> "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (Prop. 21, § 11; see § 190.2, subd. (a)(22).)

Proposition 21 provided that its provisions could not be amended by the Legislature except by a two-thirds vote of each house, or a statute that becomes effective only when approved by the voters. (Prop. 21, § 39.)

**B.** *Assembly Bill 333*

**1.** **Changes to Subdivision (f)**

Effective January 1, 2022, Assembly Bill 333 amended subdivision (f) of section 186.22 – the provision referenced in the special circumstance established by Proposition 21. (See Stats. 2021, ch. 699, §§ 1–5.) Before Assembly Bill 333, this provision defined a criminal street gang as: "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f).)

Assembly Bill 333 amended the definition of criminal street gang to read: "an ongoing, organized association or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the

---

[14] For most other first degree murders, there is a third possible sentence: 25 years to life in prison. (See § 190, subd. (a).)

20.

criminal acts enumerated in subdivision (e), having a common name or common identifying sign or symbol, and whose members collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f); Stats. 2021, ch. 699, §§ 1–5.)

Under subdivision (f), one necessary aspect of a criminal street gang is that it has, as one of its primary activities" the commission of crimes listed in subdivision (e). Assembly Bill 333 amended subdivision (e)'s list of crimes, which in turn affects subdivision (f). (See Stats. 2021, ch. 699, §§ 1–5.)

### 2. Changes to Subdivision (e)

Prior to Assembly Bill 333, subdivision (e) defined the phrase "pattern of criminal gang activity" as: "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons…." (Former § 186.22, subd. (e).)

Subdivision (e)(1) through (33) then listed several offenses, such as assault with a deadly weapon, robbery, and discharging a firearm from a motor vehicle. (Former § 186.22, subd. (e).)

After Assembly Bill 333's amendments, subdivision (e) now defines "pattern of criminal gang activity as: "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of, two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and within three years of the date the current offense is alleged to have been committed, the offenses were committed on separate occasions or by two or more

21.

members, the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational….”  (§ 186.22, subd. (e)(1).)

Assembly Bill 333 also precludes the use of the presently charged offense to establish the pattern of criminal gang activity.  (§ 186.22, subd. (e)(2).)

Assembly Bill 333 also eliminated certain crimes from the list in subdivision (e), including looting, felony vandalism, and several crimes related to access cards, documents or identity theft (§§ 484e, 484f, 484g, 530.5, 529.7; see § 186.22, subd. (e)(1)(A)–(Z).)  As a result of Assembly Bill 333, these crimes cannot be used to establish a pattern of criminal gang activity.  Additionally, looting and felony vandalism can no longer be used to establish the requisite “primary activities” of the group or association under subdivision (f).[15]

## C.    *Effect of Changes Wrought by Assembly Bill 333*

As detailed above, Assembly Bill 333 substantially narrowed subdivision (f)’s definition of criminal street gang in several important ways.  After Assembly Bill 333’s amendment, subdivision (f) now excludes from the definition of a criminal street gang those associations or groups whose members have individually – but not collectively – engaged in a pattern of criminal gang activity.

Assembly Bill 333 also narrowed subdivision (f)’s definition of a criminal street gang by substantially restricting the definition of a “pattern of criminal gang activity.”  Assembly Bill 333 imposed the new requirement that, to establish a pattern of criminal gang activity, the prior offenses must have commonly benefitted a gang, and the benefit must have been more than reputational.  Additionally, the last of the offenses used to establish a pattern of criminal gang activity now must have occurred within three years prior to the commission of the current offense.

---

[15] Even before Assembly Bill 333, the crimes related to access cards, documents, identity theft could not be used to establish the requisite primary activities.  (Former § 186.22, subd. (f).)

Moreover, Assembly Bill 333's amendment of subdivision (e) narrows subdivision (f)'s definition of a criminal street gang to now exclude those groups or associations whose primary activities include looting or felony vandalism, but do not include the crimes listed in current subdivision (e).

**D.** ***People's Initiative Power – Constitutional Limits on Legislative Power to Amend***

The People's power of initiative is greater than the power of the Legislature. (*Rossi v. Brown* (1995) 9 Cal.4th 688, 715.) " '[U]nder article II, section 10, subdivision (c) [of the California Constitution], the voters have the power to decide whether or not the Legislature can amend or repeal initiative statutes." (*Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251.) The voters' power in this regard is "absolute." (*Ibid*.)

" '[T]he purpose of California's constitutional limitation on the Legislature's power to amend initiative statutes is to "protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent." [Citations.]' [Citation.] In this vein, decisions frequently have asserted that courts have a duty to ' " 'jealously guard' " ' the people's initiative power, and hence to ' " 'apply a liberal construction to this power wherever it is challenged in order that the right' " ' to resort to the initiative process ' " 'be not improperly annulled' " ' by a legislative body." (*People v. Kelly* (2010) 47 Cal.4th 1008, 1025 (*Kelly*).)

Proposition 21 does not permit any legislative amendment except upon two-thirds passage of each house or enactments subject to voter approval. Assembly Bill 333 satisfies neither requirement. Thus, if Assembly Bill 333 amended Proposition 21 at all, it violates the Constitution.

A legislative enactment amends an initiative if it "prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court*

23.

(*Pearson*) (2010) 48 Cal.4th 564, 571.)  A legislative enactment also amends an initiative "by taking away from it."  (*Kelly*, *supra*, 47 Cal.4th at pp. 1026–1027; see also *Proposition 103 Enforcement Project v. Charles Quackenbush* (1998) 64 Cal.App.4th 1473, 1485 (*Quackenbush*).)

Consequently, a legislative enactment can be deemed an amendment to an initiative, even when it does not change the specific language enacted by the initiative itself.  (See *Kelly*, *supra*, 47 Cal.4th at pp. 1014, 1030; see also *In re Oluwa* (1989) 207 Cal.App.3d 439, 445.)  Any other rule would elevate form over substance and make it trivially easy to completely evade article II, section 10, subdivision (c) of the California Constitution – a provision we are charged with zealously guarding.

E.    *Analysis*

1.    **Assembly Bill 333 Amends Proposition 21 by Taking Away from It**

We conclude Assembly Bill 333 is an amendment of Proposition 21.  Section 11 of Proposition 21 essentially provided that a certain subset of murders (i.e., gang murders) would be subject to the death penalty or LWOP under section 190.2.  Assembly Bill 333 would reduce the scope of murders punishable under section 190.2, subdivision (a)(22) in several ways, as the examples provided below demonstrate.  In this way, Assembly Bill 333 "takes away" (*Quackenbush*, *supra*, 64 Cal.App.4th at p. 1485) from Proposition 21.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group whose members have individually, but not collectively, engaged in a pattern of criminal gang activity, would be subject to a

sentence of death or LWOP under section 190.2, subdivision (a)(22).[16]  Not so under Assembly Bill 333.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group that engages, or has engaged, in a pattern of criminal gang activity that benefitted the gang only in reputational ways, would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22).  Not so under Assembly Bill 333.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group whose primary activities include looting and felony vandalism, but do not include the other crimes listed in section 186.22, subdivision (e) would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22).  Not so under Assembly Bill 333.

Under section 11 of Proposition 21, a defendant who intentionally killed the victim while an active member of a group that engaged in a pattern of criminal gang activity as evidenced by past crimes that met former subdivision (e)'s requirements but not the new requirement that the last offense have occurred "within three years of the date the current offense is alleged to have been committed," would be subject to a sentence of death or LWOP under section 190.2, subdivision (a)(22).  Not so under Assembly Bill 333.

Because Assembly Bill 333 "takes away" from the scope of conduct that Proposition 21 made punishable under section 190.2, it is an amendment.  While the Legislature was free to amend Proposition 21 in this fashion, it could only do so with a two-thirds vote in each house.  (Prop. 21, § 39.)  Assembly Bill 333 did not comply with that requirement and therefore cannot amend Proposition 21.

---

[16] Assuming the murder otherwise met the remaining requirements of section 190.2, subdivision (a)(22). This qualification applies to all the ensuing examples as well.

### 2. Punishment of a Crime is not Distinct from the Definition of the Crime Being Penalized

With commendable candor, the Attorney General states there are counterarguments to these conclusions. However, we, like the Attorney General, find them unpersuasive.[17]

The Attorney General cites *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270 (*Gooden*), which dealt with a similar issue involving Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) and Proposition 7. Among other things, Proposition 7 increased the punishment for first degree murder. Proposition 7 did not authorize the Legislature to amend or repeal its provisions without voter approval. The Legislature subsequently passed Senate Bill 1437, which narrowed the universe of conduct constituting first degree murder. *Gooden* held Senate Bill 1437 did not amend Proposition 7.

*Gooden* held that provisions establishing the punishment of a crime concern a subject "distinct" from those addressed by provisions defining the crime. This conclusion is misguided.

Punishment is a period of confinement, fine, etc. imposed *for* engaging in criminal conduct. (*Gooden*, *supra*, 42 Cal.App.5th at p. 281 quoting *People v. Ruiz* (2018) 4 Cal.5th 1100, 1107.) In other words, punishment is the *consequential relationship* between a criminal penalty *and the conduct on which it is being imposed*.

Because both the penalty and its application to specific, real-world conduct are essential components, punishment is more than specifying a particular number of years in

---

[17] The Attorney General would distinguish *Gooden* on different grounds than we do. The Attorney General notes that while Proposition 7 increased the punishment for an existing crime; Proposition 21 created a special circumstance where none had existed before. And the relevant provisions of Proposition 7 did not incorporate by reference the provisions altered by Senate Bill 1437; whereas section 190.2, subdivision (a)(22) incorporates by reference a provision altered by Assembly Bill 333 (§ 186.22, subd. (f).) However, these formalistic distinctions do not go to the heart of the issue.

prison or the dollar amount of a fine.  A statute would be nonsensical and meaningless if it only enumerated a penalty in the abstract, without identifying the crime to which it applies.  Identifying the scope of conduct being penalized is as crucial to punishment as identifying the severity of the penalty.

The connection between conduct and consequence is the very core of the policy choice embodied in a punishment provision.  Changing the scope of conduct to which particular penalties are attached "amends" that policy choice, for better or worse.

For these reasons, punishment and the scope of conduct being penalized (i.e., the elements of the crime) are not distinct issues.  Not because they are "synonymous" (*Gooden*, *supra*, 42 Cal.App.5th at p. 281), but because the latter is an integral, *constituent part* of the former. They are not just related, they are definitionally and conceptually inseparable. They are not distinct.

The dissent acknowledges that, in enacting Proposition 21, the voters undoubtedly intended to increase the punishment for *certain* gang-related murders.  (Conc. & Dis. opn. at pp. 4–5, *post*.)  However, the dissent asserts the increased punishment intended by the voters "survives" Assembly Bill 333.  (*Ibid.*)  But that simply is not true for the certain gang murders described above in part III.E.1. of the Discussion, *ante*, which are no longer subject to section 190.2 by virtue of Assembly Bill 333.

Since punishment is the *application* of a criminal penalty *to* a particular universe of conduct, narrowing that universe effects a change in *punishment* with respect to the newly excluded conduct. This is true even when the penalty attached to the remaining conduct remains unchanged.

A hypothetical helps illustrate.  Imagine a jurisdiction where the only crime relating to driving under the influence was defined as "operating a motor vehicle with a blood-alcohol content of over 0.08" and carried a punishment of six months in jail.  And suppose the voters, apparently angered by deaths and injuries caused by all drunk drivers, passed an initiative increasing punishment for that crime to one year in jail.  Further

27.

suppose the Legislature subsequently narrowed the definition of the crime by raising the threshold blood-alcohol content to 0.15 percent and above.  One might say such an amendment merely changed an element of the crime and did not affect punishment.  But this formalistic distinction would prove illusory because the amendment to the elements of the crime would have the direct and intentional effect of eliminating *punishment* for certain conduct – e.g., operating a motor vehicle with a blood-alcohol content of 0.09 to 0.14 percent. This exposes the truth that a legislative change to the *elements* of a crime does affect the *punishment* established by the voters.

Fortunately, the framework set forth in *Pearson* and other cases cuts through the formalism of this false distinction by asking a question that goes directly to the heart of the issue:  Does the legislative enactment prohibit what the initiative authorizes, or authorize what the initiative prohibits?  In the hypothetical above, it is clear the voter initiative authorized a one-year jail sentence for, among others, drivers with blood-alcohol content of 0.09 to 0.14 percent, whereas the legislative enactment prohibited it.  Similarly, as summarized above, section 11 of Proposition 21 authorized death or LWOP sentences for certain murderers under section 190.2, which Assembly Bill 333 would undo with respect to a certain subset of those murderers.

The contrary view seems to arise from the premise that, when enacting a punishment provision, voters are concerned with tying increased penal consequences to a particular *label* rather than to specific *conduct*.  For example, that when voters increased the punishment for murder, their intent was to increase punishment for whatever conduct that might be labeled as murder in the future, rather than the real-world conduct encompassed by the definition of murder at the time of enactment.  (See, e.g., *People v. Nash* (2020) 52 Cal.App.5th 1041, 1061–1063 [rejecting argument that Proposition 7's reference to "murder" incorporated "the substantive offense of murder as it stood in 1978."]; *Gooden*, *supra*, 42 Cal.App.5th at pp. 282–284.)  To articulate this premise fully is to see that it is untrue.  Just imagine a jurisdiction where voters passed an initiative to

increase the punishment for robbery from two years in prison to four years, and then the Legislature then swapped the definitions of robbery and burglary. Common sense tells us voters who seek to increase punishment intend that it will be imposed on the conduct encompassed by the definition of the crime at the time of enactment.

### F. *Conclusion*

Because Assembly Bill 333 takes away from section 11 of Proposition 21, it is unconstitutional to the extent it would amend that initiative. (See Cal. Const., art. II, § 10(c).) The appropriate remedy is not to void Assembly Bill 333 in its entirety, but rather to disallow this unconstitutional application of Assembly Bill 333. (See *Kelly*, *supra*, 47 Cal.4th at p. 1048.) Consequently, we hold that Assembly Bill 333 does not alter the scope or effect of section 190.2, subdivision (a)(22). In the following section, we will analyze defendant's claims as to the murder special circumstance without regard to statutory changes made by Assembly Bill 333.

## IV. Sufficient Evidence Supported Active Participation Conviction

While we are reversing the active participation conviction due to the retroactive application of Assembly Bill 333, we still must determine whether substantial evidence supported the conviction at the time of trial. If the conviction was supported by substantial evidence at trial, then it may be retried on remand. (See *People v. Vasquez*, *supra*, 74 Cal.App.5th at p. 1033.) Otherwise, it may not be retried. (*Ibid*.)

Active participation in a gang is defined as follows: "A person who actively participates in a criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in felonious criminal conduct by members of that gang, shall be punished…." (§ 186.22, subd.(a).) "The essential elements for a conviction under section 186.22, subdivision (a) are: '(1) active participation in a criminal street gang, in the sense of participation that is more than nominal or passive; (2) knowledge that the gang's members engage in or have engaged in a pattern of criminal gang activity; and (3) the

29.

willful promotion, furtherance, or assistance in any felonious criminal conduct by members of that gang.' " (*People v. Valenzuela* (2019) 7 Cal.5th 415, 422.)

Defendant argues there is insufficient evidence of the second element – knowledge of gang members' pattern of criminal gang activity.[18]  Specifically, he argues that none of his prior contacts with law enforcement involved him being in the company of gang members engaged in pattern criminal activity.  But that argument wrongly implies the only way a jury could reasonably infer he had the requisite knowledge is if he personally witnessed the criminal activity.

It is true that some cases involve *direct* evidence of a defendant's knowledge. (See *People v. Garcia* (2007) 153 Cal.App.4th 1499, 1509–1510.)  However, that is not often the case.  "Knowledge, like intent, is rarely susceptible of direct proof and generally must be established by circumstantial evidence and the reasonable inferences to which it gives rise." (*People v. Buckley* (1986) 183 Cal.App.3d 489, 494–495.)

Here, there was substantial evidence that members of the VCL engaged in a pattern of criminal conduct.  There was also substantial evidence that defendant was a member of that gang, and a knowledgeable one at that.  He could identify the gang's rival, lived in VCL territory, and had been associating with VCL gang members for years.  His more-than-casual involvement in the gang is also supported by his willingness to kill someone after an altercation with a fellow gang member.[19]  While defendant's

---

**18** He also argues that the lack of evidence that he knew of VCL's pattern of criminal activities also dooms the gang murder special circumstance.  He cites *People v. Carr* (2010) 190 Cal.App.4th 475 in arguing that knowledge of the gang's pattern of criminal activities is required to impose the gang-murder special circumstance.  *Carr* concluded that the statute itself – section 190.2, subd.(a)(22) – imposes no such knowledge requirement.  We agree.  However, *Carr* proceeded to hold that the Constitution requires the imposition of a such a requirement, in spite of its absence from the statutory text.  (*Carr*, *supra*, at pp. 487–488.)  We need not determine whether we agree with that holding, as we find that substantial evidence supported that element here.

**19** Defendant contends that "[o]ther than the crime itself, the evidence that [he and Rojas] knew one another was de minimis."  But we cannot disregard "the crime itself."

30.

enmeshment with the gang is not *direct* evidence, it raises a strong circumstantial *inference* that defendant would know VCL's pattern of criminal conduct. For that reason, we will not disturb the jury's determination.

## V. Sufficient Evidence Established the Gang Relatedness of the Murder

Defendant argues there was insufficient evidence the murder was gang related, and that as a result we must reverse the gang enhancement (§ 186.22, subd. (b)(1)) and the gang-murder special circumstance (§ 190.2, subd. (a)(22).) We disagree.

Below, we summarize the substantial evidence from which a jury could conclude the murder was gang related. Defendant is a gang member. Gang members commit violent crimes like murder to enhance their reputation within the gang and the gang's reputation in the community. This reputation enhancement discourages people from talking to law enforcement, which allows the gang to continue committing crimes. Gang members commonly work together, with one acting as a driver and the other directly committing crimes.

The gang to which defendant belongs commits homicides as one of its primary activities. Defendant's fellow gang member, Rojas, got into an altercation with an individual, who then ran away. Defendant and Rojas pursued the victim together. Defendant then shot and killed the victim.

From this evidence, a reasonable jury could infer that defendant and Rojas, fellow gang members, jointly engaged in one of their gang's primary activities in order to enhance their gang's reputation for retaliatory violence. The fact that defendant became involved at all after Rojas's altercation with Ellington – and indeed was the shooter – raises a strong inference that the murder was motivated by the need to uphold or enhance

---

Defendant's willingness to get into a car with Rojas and gun down someone who had squared off with Rojas moments before is very strong evidence that defendant and Rojas knew each reasonably well beforehand.

the gang's reputation for retaliatory violence rather than any personal disagreement between Rojas and Ellington.[20]

While it may be theoretically possible that two members of an organization that commits homicides as one of its primary activities and is concerned with maintaining a reputation for violence and respect happened to kill a person following an altercation for reasons unrelated to these aspects of their gang – that observation is not dispositive on substantial evidence review. " ' " ' " ' " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.' " ' " ' " ' "[21] (*People v. Ghobrial* (2018) 5 Cal.5th 250, 278.)

## VI. Pitchess

Defendant contends the court erred in related to matters arising under *Pitchess.*

### A. *Background*

On June 5, 2019, the defense moved for an order requiring Kern County to produce certain records regarding Sheriff's Deputies Colbert, Romo, Fernandez, Perez, and Vega. Specifically, the motion sought contact information for everyone who had filed any complaints against the deputies, involving dishonesty or who were interviewed in connection with any such investigation, the dates any such complaints were filed, and the nature of any disciplinary action taken. Each of the deputies later testified at defendant's trial regarding his prior contacts with law enforcement. Deputy Fernandez

---

[20] Defendant counters that Ellington's behavior elicited a response from other patrons, not just Rojas. This misses the point. The relevant point is not that Ellington's altercation occurred solely with Rojas – it perhaps involved others as well – but rather that defendant was *not* involved in the initial altercation.

[21] Defendant's remaining contentions, such as reversal being warranted because he was unaware of the predicate offenses, or because some of the gang-related circumstances found in other cases are not present here, are rejected for the same reason.

also testified as a gang expert and Deputy Colbert also testified about defendant's arrest for the present offenses.

With the motion, defense counsel included a declaration stating that his investigation into the case yielded information contradicting claims the deputies had made on various reports and field interview cards.

The sheriff's office argued that defendant only made a sufficient showing for in camera review of records for Deputy Colbert and Deputy Fernandez, and not the remaining deputies. The sheriff's office contended that defendant had not shown that Deputies Romo, Perez, or Vega had written or contributing to any reports in the case. The sheriff's office further posited that *Pitchess* movants are limited to records within five years prior to the filing of the motion.[22]

At a hearing on June 27, 2019, the county counsel argued Deputies Romo, Perez, and Vega, were only remotely connected to the case because they only authored field investigation cards rather than "reports."

The court granted the *Pitchess* motion as to Deputies Colbert and Fernandez, but denied it with respect to Deputies Romo, Perez, and Vega. The court reviewed documents in camera and did not order disclosure of any of them.

Defendant has two contentions on appeal.

First, that we must review the sealed portions of the record and determine whether documents should have been disclosed. We have done so and conclude that the trial court did not abuse its discretion in declining to order disclosure of documents provided by the custodian of records. (See *People v. Hughes* (2002) 27 Cal.4th 287, 330.)

---

[22] This provision of Evidence Code section 1045 was subsequently amended. But even at the time of the motion in this case, it prohibited from disclosure complaints concerning conduct occurring more than five years before "the event or transaction that is the subject of the litigation" – not five years before the *Pitchess* motion was filed. (Former Evid. Code, § 1045, subd. (b)(1).)

Second, defendant contends the court erred in denying the motion as to Deputies Romo, Perez, and Vega. We agree, as discussed below.

A *Pitchess* motion must include affidavits "showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation …." (Evid. Code, § 1043, subd. (b)(3).) "A showing of 'good cause' exists if the defendant demonstrates both (1) a 'specific factual scenario' that establishes a 'plausible factual foundation' for the allegations of officer misconduct [citations], and (2) that the misconduct would (if credited) be material to the defense." (*Giovanni B. v. Superior Court* (2007) 152 Cal.App.4th 312, 319.) The requirement of showing "good cause" before triggering in camera review is a " 'relatively low threshold.' " (*People v. Samuels* (2005) 36 Cal.4th 96, 109.)

As the Attorney General concedes, defendant met the relatively low threshold needed to trigger an in camera review of the records of Deputies Romo, Perez and Vega. He explained their relevance to the gang aspect of the case due to their authorship of field investigation cards concerning defendant. County counsel's distinction between field investigation cards and "reports" in unpersuasive. Field investigation cards document events pertinent to the gang participation charge and gang allegations. Specifically, they detail interactions that can be used to show defendant was a gang member when he committed the murder at issue here. Because the field investigation cards are material to the prosecution of defendant, evidence concerning any dishonesty on the part of their authors is material to the defense.

The Attorney General contends the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818. However, we prefer the approach taken in cases like *People v. Johnson* (2004) 118 Cal.App.4th 292 and *People v. Hustead*, *supra*, 74 Cal.App.4th at pp. 418–419, whereby the trial court takes up the question of prejudice after reviewing the records in question. That will be a far better vantage point from which to determine prejudice.

"The court in *People v. Hustead*, *supra*, 74 Cal.App.4th at pages 418–419 … reversed the judgment and remanded the matter with the following directions: '[W]e will remand the case to the trial court to conduct an in camera hearing on the discovery motion. If there is no discoverable information in the file, then the trial court is ordered to reinstate the original judgment and sentence, and the judgment is ordered affirmed. [Citation.] If, however, there is relevant discoverable information in the officer's file, … appellant should be given an opportunity to determine if the information would have led to any relevant, admissible evidence that he could have presented at trial. [Citation.] If appellant is able to demonstrate that he was prejudiced by the denial of the discovery, the trial court should order a new trial. If appellant is unable to show any prejudice, then the conviction is ordered reinstated, and the judgment is ordered affirmed.' [¶] We agree with the reasoning and disposition of *People v. Hustead* … and similarly reverse and remand the matter to the trial court with directions specified below in the disposition. If the trial court concludes defendant should have received information by virtue of his *Pitchess* motion, the proper standard for the trial court to use to determine prejudice is whether there is a reasonable probability the outcome would have been different had the information been disclosed." (*People v. Johnson*, *supra*, 118 Cal.App.4th at p. 305.)

## VII. Parole Revocation Fine

The court imposed a $300 parole revocation under section 1202.45. The parties agree this fine was improper because defendant was sentenced to life without the possibility of parole on count 1. However, we do not address the fine because defendant will be resentenced on remand.

### DISPOSITION

The judgment is conditionally reversed with directions. On remand, the trial court must conduct an in camera inspection of the requested records of Deputies Romo, Perez and Vega for relevance. If the trial court's inspection on remand reveals no relevant information, the trial court must reinstate the judgment of conviction, except as to the

35.

active gang participation count and the gang enhancement, which are addressed below.  If the inspection reveals relevant information, the trial court must order disclosure, allow defendant an opportunity to demonstrate prejudice, and order a new trial if there is a reasonable probability the outcome would have been different had the information been disclosed.

Defendant's conviction for active gang participation (§ 186.22, subd. (a)) and the gang enhancement (*id*., at subd. (b)(1)) are reversed pursuant to changes made by Assembly Bill 333.  Both the active gang participation count and the gang enhancement allegation may be retried on remand.  In either event, defendant shall eventually be resentenced.


                                                            POOCHIGIAN, ACTING P. J.

I CONCUR:


DETJEN, J.

SNAUFFER, J., Concurring and Dissenting.

I concur with the majority in regard to the issues presented in sections I, II, IV, V, VI, and VII of the opinion. However, I respectfully dissent only in regard to section III, and would vacate the special circumstance finding as a consequence of Assembly Bill No. 333, as explained below.

Proposition 21, a voter initiative, added the gang-related murder special circumstance to the Penal Code.[1] The special circumstance sets the penalty for first degree murder at "death or imprisonment in the state prison for life without the possibility of parole" if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subdivision (a)(22).)

Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 1-5) (AB 333), as relevant, amends the section 186.22, subdivision (f) "criminal street gang" definition. The majority concludes this amendment is unconstitutional as applied to the gang-related murder special circumstance because it impermissibly amends a voter initiative. (Maj. opn. *ante*, at p. 24; see *People v. Cooper* (2002) 27 Cal.4th 38, 44 (*Cooper*) [limits on amending initiative enactments].) For the following reasons, I would conclude AB 333 is not an unconstitutional amendment.

Our Supreme Court has "described an amendment as 'a legislative act designed to change an existing initiative statute by adding or taking from it some particular provision.' [Citation.] But this does not mean that any legislation that concerns the same subject matter as an initiative, or even augments an initiative's provisions, is necessarily an amendment for these purposes. 'The Legislature remains free to address a " 'related but distinct area' " [citations] or a matter that an initiative measure "does not specifically

---

[1] All statutory references are to the Penal Code.

authorize *or* prohibit." ' [Citations.] In deciding whether" AB 333 amends Proposition [21] "we simply need to ask whether it prohibits what the initiative authorizes, or authorizes what the initiative prohibits." (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571 (*Pearson*).)

"In resolving the question, we must decide what the voters contemplated. '[T]he voters should get what they enacted, not more and not less.' [Citation.] [¶] This is a question of statutory interpretation. When we interpret an initiative, we apply the same principles governing statutory construction. We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole. If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure. " (*Pearson, supra,* 48 Cal.4th at p. 571.)

"Section 190.2[, subd.] (a)(22) was enacted as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, an initiative measure adopted by the electorate at the March 2000 primary election." (*People v. Shabazz* (2006) 38 Cal.4th 55, 65 (*Shabazz*).) Because this section itself remains intact, it sheds no light on the issue[2] and we must look beyond it to divine voter intent.

As pertinent, Proposition 21's "findings and declarations … announced: 'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. *Life without the*

---

[2] Section 190.2, subdivision (a)(22), states in full: "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

2.

*possibility of parole or death should be available to murderers who kill as part of any gang-related activity.'* " (*Shabazz, supra,* 38 Cal.4th at p. 65.) "The legislative analysis of Proposition 21 contained a summary chart of the gang provisions, and stated that [it] '[i]ncreases penalties for gang-related crimes ….' " (*Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 906.)

In my view, "the voters who approved Proposition [21] … got, and still have, precisely what they enacted—stronger sentences for persons convicted of [gang-related special circumstance] murder …. By enacting [AB 333], the Legislature has neither undermined [this] initiative[] nor impinged upon the will of the voters who passed" it. (*People v. Superior Court (Gooden)* 42 Cal.App.5th 270, 289 (*Gooden*); accord *People v. Nash* (2020) 52 Cal.App.5th 1041, 1058-1061 (*Nash*).)

The majority attempts to distinguish *Gooden, supra,* from Proposition 21 by stating *Gooden* "is misguided" in separating crime and punishment. The majority claims separating crime and punishment in this situation is incorrectly "premise[d]" on the view "that, when enacting a punishment provision, voters are concerned with tying increased penal consequences to a particular *label* rather than to specific conduct." (Maj. opn. *ante*, at pp. 26, 28-29.) The majority concludes "common sense tells us voters who seek to increase punishment intend that it will be imposed for the conduct encompassed by the definition of the crime at the time of enactment."[3] (*Ibid.*)

---

[3] On this point, *In re Oluwa* (1989) 207 Cal.App.3d 439 (*Oluwa*) is instructive. There, the electorate passed Proposition 7, an initiative which included a limitation for convicted murderers earning postsentence custody credits. To achieve the limit, the electorate rewrote the section delineating punishment for murder (§ 190) by including in it a reference to " 'Article 2.5' " credits. (*Oluwa, supra,* at p. 442.)

"At the time of the enactment of Proposition 7, article 2.5 contained only sections 2930, 2931 and 2932. These sections outlined the manner in which prisoners might reduce their sentences by a maximum one-third for good behavior and participation in prison programs." (*Oluwa, supra,* 207 Cal.App.3d at p. 442.)

But "[t]he definition of a crime is distinct from the punishment for a crime." (*People v. Solis* (2020) 46 Cal.App.5th 762, 779.) A special circumstance allegation is a penalty provision. It "is not a complete offense in itself. It is 'separate from the underlying offense and does not set forth elements of the offense or a greater degree of the offense charged.' " (*People v. Anderson* (2009) 47 Cal.4th 92, 115; see *People v. Jones* (2009) 47 Cal.4th 566, 576 [describing penalty provisions].) As relevant here, the electorate prescribed an alternate punishment for some gang-related murders but did not otherwise establish a new crime.[4]

The Proposition 21 electorate was undoubtedly concerned with increasing the punishment for certain gang-related murders.[5] That increased punishment—life without

_____

The legislative analysis accompanying the initiative specifically explained a convicted second degree murderer " 'would have to serve at least 10 years before becoming eligible for parole.' " (*Oluwa, supra,* 207 Cal.App.3d at pp. 442-443.) Later, the Legislature added sections 2933, 2934, and 2935 to Article 2.5. These sections created additional credit earning opportunities for convicted murderers. (*Oluwa, supra,* at p. 443.)

When Oluwa, who began serving his sentence for murder in the interim, sought to benefit from the new statutes, the appellate court rejected his argument because it would contravene voter intent. The court explained, in part, the legislative analysis made clear the "electorate … intended service of 10 calendar years by a second degree murderer before parole consideration." (*Oluwa, supra,* 207 Cal.App.3d at p. 445; *Cooper, supra,* 27 Cal.4th at p. 45 [*Oluwa* court relied on legislative analysis explanation to ascertain voter intent].).

In contrast, Proposition 21 contains no similar specific explanatory analysis. It focuses on punishment for gang-related murders. That focus endures.

[4] Proposition 21 did enact other crimes provisions, for example sections 182.5 and 186.26.

[5] By certain I mean only those gang-related murders in which the defendant killed *while* actively participating in a criminal street gang *and* were "carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) Such murders are a subset of all gang-related murders.

parole or death—survives AB 333. Accordingly, I respectfully dissent from the majority's conclusion AB 333 does not apply to section 190.2, subdivision (a)(22). I would instead vacate the jury's special circumstance finding based on reasons identical to the People's concession to reverse all other gang-related findings.[6] (Maj. opn., *ante* at p. 2.)

SNAUFFER, J.

---

[6] It is important to note AB 333 did more than amend section 186.22. It also created section 1109 which mandates bifurcation in trials charging a gang-related crime allegation (§§ 186.22, subds. (b) & (d)) or the substantive gang crime itself (§ 186.22, subd. (a)). Bifurcation is a procedural matter independent of the amendments to section 186.22. In other words, if the amendments to section 186.22 did not exist, section 1109 would still require bifurcation.

It is unclear whether the section 1109 bifurcation preference would apply to the gang-related murder special circumstance, whether it would apply retroactively to nonfinal cases, whether it constitutes prejudice in this case, or whether it too is an unconstitutional amendment. (See *People v. Montano* (2022) __ Cal.App.5th ___ [2022 WL 2236331] [§ 1109 does not apply to § 190.2, subd. (a)(22)].) What is clear, however, is the section 1109 issue merits independent consideration.

Finally, it is worth noting the constitutional argument the majority relies on was first raised in the final brief filed by the People. The court's briefing schedule afforded Nunez no opportunity to respond to the argument. (See Gov. Code, § 68081.)